**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEAH MURAWSKI,** | : | **Civil No.  1:22-CV-1786** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM OPINION</u>**

**I.**     **<u>Introduction</u>**

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g.</u>, <u>Perales</u>, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S. Ct. 206. <u>See</u> <u>Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Leah Murawski applied for disability and disability insurance benefits, as well as supplemental security income, under Titles II and XVI of the Social Security Act on September 5, 2019, alleging an onset date of disability of August 16, 2019. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Murawski was not disabled during the relevant period and denied her application for benefits. Murawski now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.

While Ms. Murawski's circumstances evoke sympathy, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.    **Statement of Facts and of the Case**

Murawski filed her claim for disability benefits on September 5, 2019, alleging an onset date of August 19, 2019. (Tr. 51). Murawski alleged disability due to the following impairments: bipolar disorder, generalized anxiety disorder, and a

2

learning disability. (Tr. 77). She was 25 years old at the time of her alleged onset of disability, had at least a high school education, and had past relevant work experience as a retail sales associate and a psychiatric technician. (Tr. 65).

With respect to Murawski's impairments, the medical record revealed the following: Murawski had a history of mental health treatment since elementary school and had treated with Dr. John Boswell, M.D., a psychiatrist, since 2003. (Tr. 392-417). Prior to the relevant period, in August of 2011, Murawski was discharged from an inpatient psychiatric hospitalization when she was 17 years old. (Tr. 357-61). Discharge records indicate diagnoses of bipolar disorder and a history of physical abuse, as well as obesity, diabetes, and hypothyroidism. (Tr. 360). These notes also indicate that Murawski had been prescribed Lithium which seemed to help with her bipolar disorder. (Tr. 361). Later that year in October of 2011, she underwent a neuropsychological assessment with Dr. Richard Dowell, Ph.D. (Tr. 364-74). Dr. Dowell diagnosed her with a learning disorder, bipolar disorder, and family relationship problems. (Tr. 373). A June 2012 disability evaluation performed by Dr. David Smock, Ph.D., indicated that Murawski was pregnant, living alone in an apartment, and managing adequately. (Tr. 385). She was employed at Wal-Mart part-time. (Tr. 386). A mental status examination indicated normal findings with the exception of somewhat impaired attention and concentration. (Tr. 387-88).

Over the next few years, Murawski continued to treat with Dr. Boswell. (Tr. 392-97). In May of 2016, she underwent a psychiatric evaluation with Dr. Andrew Cole, Psy.D. (Tr. 420-26). A mental status examination revealed a cooperative demeanor, appropriate eye contact, full affect, euthymic mood, intact attention and concentration, coherent and goal-directed thought processes, and fair judgment and insight. (Tr. 421-22). Murawski reported that she did not socialize, but she was able to perform personal care, cook, clean, do laundry, shop, and manage her money. (Tr. 422).

Dr. Boswell's treatment notes from August of 2018 indicate that Murawski presented complaining of slurred speech and a stutter, noting that she thought it could be a "manic thing." (Tr. 443). A mental status examination showed an appropriate affect, she was tearful at times, her speech was slightly pressured, and her mood was okay. (Tr. 444). In October, Dr. Boswell noted that Murawski had not been taking her Lithium and she had been extra stressed and not sleeping well. (Tr. 445). Dr. Boswell restarted her Lithium. (Id.) In February of 2019, Murawski reported that she had received a promotion at work, but she was being discriminated against. (Tr. 446). However, in May, Murawski reported that she was doing well, her mood had been good and stable, and she was taking her Lithium regularly. (Id.)

4

Just prior to the relevant time period, in August of 2018, Murawski reported feeling more down than usual but her mood had been better the last two days. (Tr. 447). Dr. Boswell noted that she was stressed by her job and her new boss, and that she felt overwhelmed some days and was unable to focus. (Id.) These notes further indicate that Murawski's OVR counselor thought she needed to quit her job. (Tr. 448). On mental status examination, she was tearful at times and her mood was stressed, but the remaining findings were normal. (Id.) Dr. Boswell continued her Lithium. (Id.) On this same day, Dr. Boswell wrote a "To Whom It May Concern" letter, which indicated that he was concerned about Murawski's ability to work at that time due to work related stress. (Tr. 675). Dr. Boswell's letter further indicated that he recommended she resign from her current position to help her regain stability. (Id.) Treatment notes from Dr. Boswell in September of 2019 noted that Murawski was feeling better and had quit her job. (Tr. 448). She had received other job offers but did not think she could handle the stress of working. (Id.) Her mental status examination showed a good mood and no other abnormal findings. (Id.)

Around this same time, Murawski was treated for Lithium-induced hypothyroidism. (Tr. 472). Treatment notes indicated that Murawski was nervous and anxious at this visit. (Tr. 474). Also at this time, Murawski began seeing a nutritionist (Tr. 794). Indeed, the record indicates that Murawski was categorized as

5

morbidly obese during the relevant time period, as she stood roughly 5 feet 7 inches tall and weighed between 300 and 325 pounds, resulting in a BMI of over 40. (Tr. 450, 452, 461, 474, 479, 528, 536, 538, 698, 716, 758, 794, 904, 943).

At an office visit in February of 2020 for her hypothyroidism, treatment notes indicate that Murawski was not nervous or anxious, did not have insomnia, and showed no signs of depression. (Tr. 527). Therapy notes from this time indicated that Murawski was making progress toward her objectives, and a screening assessment showed some difficulty with completing work tasks but little to no difficulty with other areas of functioning. (Tr. 821-22). She reported going on a date (Tr. 848), and treatment notes from later in February indicated a decrease in her symptoms. (Tr. 852). In March, Murawski reported that she wanted to volunteer over the summer to decrease her social isolation. (Tr. 856).

In April of 2020, Murawski began treating with Dr. Ronald Pope, D.O., as Dr. Boswell had retired. (Tr. 810). A mental status examination at this time revealed that Murawski was cooperative, her affect was a bit labile, she jumped from topic to topic, and she reported she had been angry at her former job. (Tr. 812-13). Dr. Pope diagnosed her with PTSD and mood disorder. (Tr. 813). Therapy notes from this time indicated that Murawski was moving her family to a new home, but that they were struggling with isolation due to Covid-19. (Tr. 864). In May of 2020, Murawski

reported feeling rushed because she was moving sooner than she had thought but was excited about the move. (Tr. 872). She also reported going on a date with a man she had been talking to that went well. (Id.)

In June of 2020, Dr. Pope filled out an assessment of Murawski, noting her diagnoses of bipolar disorder and generalized anxiety disorder. (Tr. 676). While Dr. Pope did not completely fill out this form, he indicated that Murawski had problems paying her bills, and that she should avoid social experiences. (Tr. 676). He further opined that Murawski would be off task for at least 20% of the workday and would be absent more than 2 days per month. (Tr. 677). Regarding her work limitations, Dr. Pope opined that Murawski was extremely impaired in her ability to maintain concentration and attention; to understand, remember, and carry out even simple instructions; and to work in coordination with others. (Tr. 677-78). He further noted moderate to marked limitations in the ability to make simple work-related decisions; accept instructions from supervisors; and get along with coworkers. (Tr. 678).

Notably, around this same time in June of 2020, psychiatric progress notes from Diakon Family Life Services indicated that Murawski was sleeping 8 hours per day, her mood had been good for a year, and her mental status examination was normal. (Tr. 817). A therapy note from this time similarly indicated that Murawski was experiencing a decrease in her symptoms. (Tr. 880). In July of 2020, treatment

notes indicate that Murawski was medication compliant and reported stabilized symptoms, and she was continuing to do well. (Tr. 884). It was further noted that Murawski was arranging for medical services at another agency at this time. (Id.)

Murawski underwent another psychiatric evaluation in September 2020 at SunPointe Health, as she was seeking medication management after Dr. Pope retired. (Tr. 914). On mental status examination, her attitude was appropriate and cooperative; her mood was good, and she had good eye contact; her thought processes were clear and appropriate; her memory and attention and concentration were normal; and her insight and judgment were adequate. (Tr. 916). It was further noted that Murawski had good insight into her psychiatric problems, and she had family support. (Id.) Treatment notes indicate that there were no adjustments made to her medication since she had been stable on Lithium for one year. (Id.) At a follow up appointment in October, Murawski reported that she had discontinued her Lithium briefly because she thought she was pregnant. (Tr. 921). Her mental status examination was normal, and she was advised to continue her Lithium. (Tr. 922-23).

Murawski began treating with a new counselor in November at Keystone Counseling. (Tr. 931). Her intake form indicated that was continuing therapy services to "check in" for her bipolar disorder. (Id.) This form noted that Murawski had recently broken up with a boyfriend and had suffered a miscarriage. (Tr. 934).

She reported symptoms of mania and anxiety but no panic attacks. (Tr. 935). Her mental status examination revealed a cooperative attitude; good eye contact and concentration; normal speech and thought processes; and a high energy level. (Tr. 938). It was further noted that Murawski was able to transition successfully to change and accept changes in routine with minimal support. (Tr. 939).

In December, Murawski reported to her counselor that she was feeling good since her last visit and had been stable on her medication for the last two weeks. (Tr. 924). She denied any hypomanic episodes, and her mental status examination was normal. (Tr. 924-25). At a visit in February of 2021, Murawski reported feeling okay after she had the flu for a few weeks. (Tr. 927). Her mood was reported as stable with no hypomanic episodes, and she denied anxiety. (Id.) A mental status examination revealed normal findings, and she was continued on her medication. (Tr. 928-29).

It is against this medical backdrop that the ALJ held a telephonic hearing on Murawski's claim on April 22, 2021. (Tr. 7-45). At the hearing, both Murawski and a Vocational Expert testified. (Id.) By a decision dated May 28, 2021, the ALJ denied Murawski's application for benefits. (Tr. 48-72).

In that decision, the ALJ first concluded that Murawski met the insured status requirements under the Act through December 31, 2024, and she had not engaged in

9

any substantial gainful activity since her alleged onset date of August 16, 2019. (Tr. 54-55). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Murawski had the following severe impairments: depression, bipolar disorder, anxiety, post-traumatic stress disorder ("PTSD"), and morbid obesity. (Tr. 54). At Step 3, the ALJ determined that Murawski did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 54-57). In terms of her mental limitations, the ALJ found that Murawski had a mild limitation in understanding, remembering, or applying information, and moderate limitations in interacting with others, managing oneself, and concentrating, persisting, or maintaining pace. (Tr. 55-56). The ALJ also considered Murawski's obesity but found that the evidence did not indicate that her obesity exacerbated her conditions to listing-level severity. (Tr. 54).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Murawski's limitations from her impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she should avoid unprotected heights. She can occasionally climb ladders and scaffolds and frequently climb ramps and stairs. She could tolerate occasional exposure to extreme heat and humidity. She is able to understand, retain, and carry out detailed but not complex instructions. She is capable of occasional decision-making with respect to work-related activities. She should avoid occupations, which would involve a fast production rate pace work, such as quotas, piecework,

and timed work. She should avoid interaction with the public except for incidental contact. She could engage in occasional interaction with co-workers and supervisors. However, she should avoid group, team and tandem work activity.

(Tr. 57).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Murawski's testimony regarding her impairments. On this score, the ALJ considered the opinions of the state agency consulting sources. Regarding her physical limitations, the ALJ found the state agency medical opinions generally persuasive, in that these opinions limited Murawski to a range of medium exertional work. (Tr. 62-63). The ALJ reasoned that these opinions were consistent with the evidence that established Murawski's obesity but consistently noted normal physical examination findings throughout the relevant period. (Tr. 63).

Regarding her mental limitations, the ALJ found the opinions of Dr. Karen Plowman and Frank Mrykalo, Ed.D, generally persuasive. These opinions in November of 2019 and November of 2020 found that Murawski was mildly to moderately limited in the four broad areas of functioning and limited her to a range of simple, routine tasks. (Tr. 77-78, 81-83, 105-07, 115). The ALJ noted that these opinions were generally persuasive to the extent that they were consistent with the records showing Murawski was not precluded from all work. (Tr. 63). The ALJ

further reasoned that the evidence, as well as the hearing testimony, indicated that Murawski could perform work within the limits of the RFC, including carrying out detailed instructions, occasionally making work-related decisions, avoiding production pace work, occasional interaction with coworkers and supervisors but avoiding contact with the public, and avoiding group or tandem work. (Id.) The ALJ noted that these limitations were consistent with the evidence outlined in the decision, including the largely normal and benign mental status examination findings during the relevant period.

The ALJ also considered the opinions of Dr. Boswell and Dr. Pope and found these opinions unpersuasive. (Tr. 63-64). The ALJ noted that Dr. Boswell submitted a letter in August of 2019 that advised that Murawski would benefit from quitting her job to avoid stressors and regain stability. (Tr. 63). However, the ALJ reasoned that this letter was vague and appeared to rely on Murawski's subjective symptoms. (Id.) He further indicated that this letter and this limitation was inconsistent with Dr. Boswell's own clinical records from that time which showed normal mental status examination findings. (Id.) Although the ALJ noted that Dr. Boswell had a long treatment history with Murawski, he found that this treatment consistent of routine medication management and that on examination, Murawski exhibited largely normal mental status examination findings. (Id.) Regarding the extreme limitations

12

set forth in Dr. Pope's June 2020 opinion, the ALJ found Dr. Pope's opinion unpersuasive because Dr. Pope's own findings were not consistent with the extreme limitations he alleged. (Tr. 64). On this score, he noted that Dr. Pope's examinations at this time revealed that Murawski was sleeping 8 hours per night, her mood was good and had been stable for a year, she had linear and goal-directed thought processes, and she needed no adjustment to her medications. (Id.) The ALJ further noted that psychotherapy notes from this time revealed that Murawski was dating, using coping skills to deal with her stressors, and was doing well and stable. (Id.)

The ALJ also considered Murawski's testimony but ultimately found that Murawski's complaints were not entirely consistent with the medical evidence of record. (Tr. 58-62). Murawski testified that she experienced regular panic attacks, and that she struggled to socialize and interact with others. (Tr. 17-18). She reported that she was able to drive and use a smart phone. (Tr. 18). She discussed her previous employment at Wal-Mart, in that she struggled to understand expectations and directions, and that verbal instructions increased her anxiety. (Tr. 19-20). She also reported that she had problems with time management and teamwork, and she did not take redirection or criticism well. (Tr. 20-21, 28). Murawski reported that her mother accompanied her to her medical appointments because she could not understand what her providers were telling her about her diagnoses and care plans.

13

(Tr. 30). She testified that she was able to perform household chores on a good day, but that on bad days she was unable to do anything. (Tr. 31). Murawski further reported that even though her conditions were listed as "stable," she still had to continue with therapy in order to manage her symptoms. (Tr. 32-33). She testified that her mother helped her with her two children, and that her father took care of paying her bills. (Tr. 12-13, 34). Murawski stated that she experienced weight gain due to her depression and overeating, and that she also experienced migraines when she had a panic attack. (Tr. 35-36).

The ALJ ultimately found that Murawski's complaints were not entirely consistent with the medical record. On this score, the ALJ noted her history of mental health treatment dating back to childhood, including a 2011 inpatient psychiatric hospitalization, as well as consultative mental health assessments in June 2012 and May of 2016, prior to the relevant period. (Tr. 59). He further noted that just prior to the relevant period, Murawski sought mental health treatment due to trouble concentrating and a history of physical and sexual assault. (Id.) After detailing the medical records throughout the relevant time period, many of which showed largely normal mental status evaluations and that Murawski reported improvement in her symptoms, the ALJ found that Murawski's relatively conservative treatment and activities of daily living did not support her alleged level of limitation. (Tr. 62). The

ALJ reasoned that Murawski treated mainly with medication management and outpatient therapy, and that she lived alone with her children, drives a car, and could maintain her activities of daily living adequately. (Id.) Accordingly, the ALJ found that Murawski was not as limited as she alleged. (Id.)

Having arrived at this RFC assessment, the ALJ found at Step 4 that Murawski could not perform her past relevant work but ultimately found at Step 5 that Murawski could perform work available in the national economy as a sandwich maker, box maker, and janitor. (Tr. 65-66). Accordingly, the ALJ concluded that Murawski did not meet the stringent standard for disability set by the Act and denied her claim. (Tr. 67).

This appeal followed. (Doc. 1). On appeal, Murawski contends that the ALJ erred in his assessment of her treating physicians, Dr. Boswell and Dr. Pope, and further gave improper consideration to the state agency consulting opinions. She also asserts that the ALJ improperly relied on records indicating that Murawski's conditions were "stable," and on evidence regarding her activities of daily living. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

III.   **Discussion**

    A. **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote

a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable

meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
particular "magic" words: "Burnett does not require the ALJ to use
particular language or adhere to a particular format in conducting his
analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim

made here, based upon alleged inadequacies in the articulation of a claimant's

mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

United States Court of Appeals recently addressed the standards of articulation that

apply in this setting. In Hess, the court of appeals considered the question of whether

an RFC, which limited a claimant to simple tasks, adequately addressed moderate

limitations on concentration, persistence, and pace. In addressing the plaintiff's

argument that the language used by the ALJ to describe the claimant's mental

limitations was legally insufficient, the court of appeals rejected a *per se* rule which

would require the ALJ to adhere to a particular format in conducting this analysis.

Instead, framing this issue as a question of adequate articulation of the ALJ's

rationale, the court held that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC, the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B. **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.   42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").   20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).   RFC is defined as "that which an individual is still able

to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11

(3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir.

23

2006); <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also Metzger v. Berryhill</u>, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the

ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

### C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in September of 2019 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating

opinions was changed from a hierarchical form of review to a more holistic analysis.

As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with

respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision

is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

## D. **Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms**

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is also illustrated by those cases which consider analysis of a claimant's reported pain.

28

When evaluating lay testimony regarding a claimant's reported degree of pain and

disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations,
> and this Court defers to the ALJ's assessment of credibility. See Diaz v.
> Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether
> there is substantial evidence to support an administrative law judge's
> decision, we owe deference to his evaluation of the evidence [and]
> assessment of the credibility of witnesses...."). However, the ALJ must
> specifically identify and explain what evidence he found not credible
> and why he found it not credible. *Adorno v. Shalala,* 40 F.3d 43, 48 (3d
> Cir.1994) (citing *Stewart v. Sec'y of Health, Education and Welfare,*
> 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d
> 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide
> "specific reasons for rejecting lay testimony"). An ALJ cannot reject
> evidence for an incorrect or unsupported reason. Ray v. Astrue, 649
> F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d
> 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it
> is supported by competent medical evidence. Dobrowolsky v. Califano,
> 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc.
> Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a
> claimant's subjective testimony that is not found credible so long as
> there is an explanation for the rejection of the testimony. Social
> Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social
> Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that
> there is an underlying medically determinable physical or mental
> impairment that could reasonably be expected to produce the
> individual's pain or other symptoms, however, the severity of which is
> not substantiated by objective medical evidence, the ALJ must make a
> finding on the credibility of the individual's statements based on a
> consideration of the entire case record.

McKean v. Colvin, 150 F.Supp.3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted).

Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled"). It is well settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. § 404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms

alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence, or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnoses, and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015); George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014).

### E. **The ALJ's Decision is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. Judged against these deferential standards of review, we are constrained to find that substantial evidence supported the decision by the ALJ that Murawski was not disabled. Therefore, we will affirm this decision.

Murawski first contends that the ALJ erred in his assessment of the opinion of Dr. Boswell and Dr. Pope, Murawski's treating psychiatrists. At the outset, we note that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." <u>Chandler</u>, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." <u>Durden</u>, 191 F.Supp.3d at 455. Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

Here, the ALJ considered the opinions of Dr. Boswell and Dr. Pope but found their extreme limitations unpersuasive. Regarding Dr. Boswell's August 2019 letter recommending that Murawski resign from work, the ALJ found that this letter was vague, was largely based on Murawski's subjective reports, and was inconsistent with Dr. Boswell's own notes from that time which showed normal mental status examination findings. The ALJ further noted that while Dr. Boswell treated Murawski for a long period of time prior to her alleged onset date, this treatment was mainly medication management, and his treatment notes showed relatively normal mental status findings. As to Dr. Pope's extreme limitations, the ALJ similarly found that these limitations were not consistent with Dr. Pope's own notes from that time period. While Dr. Pope opined that Murawski was moderately to extremely impaired in several areas of functioning, the ALJ reasoned that his own treatment notes from that time indicated that Murawski was sleeping 8 hours per night, her mood had been stable for a year, and her mental status examination findings were normal. Accordingly, the ALJ found these opinions unpersuasive.

The considerations cited by the ALJ in the assessment of these treating source opinions were valid grounds for discounting those opinions. Thus, an ALJ may discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008).

34

Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion, and the doctor's actual treatment notes, justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016).

In this case, the ALJ cited discrepancies between the treating source opinions and their own treating records, as well as other evidence, when finding that these opinions lacked persuasive power. These were valid factors for the ALJ to take into account when assessing opinion evidence and substantial evidence supported the ALJ's evaluation of these opinions. There was no error here.

Instead, the ALJ found the state agency psychological consultants' opinions persuasive. These opinions found that Murawski experienced mild to moderate limitations in the four broad areas of functioning. The ALJ reasoned that these opinions supported the conclusion that Murawski was not precluded from all work. The ALJ further reasoned that given the largely normal mental status findings and conservative treatment during the relevant period, Murawski was not as limited as

35

these consulting sources had opined and was able to perform work within the parameters of the RFC.

On this score, the ALJ was confronted with several medical opinions regarding Murawski's abilities in light of her mental impairments. These opinions ranged from extreme, work-preclusive limitations to limitations suggesting that Murawski experienced only mild to moderate impairments. As we have noted, "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden, 191 F.Supp.3d at 455. In the instant case, we find that the ALJ properly considered each of these medical opinions in light of the objective medical evidence in fashioning Murawski's RFC. Accordingly, the treatment of the medical opinion evidence is not grounds for a remand here.

Nor is the ALJ's treatment of Murawski's subjective testimony or his reliance on examination findings which noted that her impairments were "stable" a basis for remanding this case. First, regarding Murawski's contention that the ALJ's reliance on "stable" findings in the record was in error, we note that the ALJ did not solely rely on findings that her conditions were "stable" in crafting the RFC. Indeed, the

Court of Appeals has held that reliance on a physician's notes that indicate a claimant is stable on medication, standing alone, does not support a finding that the claimant can return to work. See Nazario v. Comm'er Soc. Sec., 794 F. App'x 204, 211 (3d Cir. 2019) (quoting Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000)). However, in this case the ALJ did not rely on findings of stability alone in the instant case. Rather, while the ALJ did consider treatment notes indicating that Murawski's conditions were stable, the ALJ also considered mental status examination findings, treatment notes indicating that Murawski's symptoms were decreasing and that she was doing well, and the opinion evidence. The ALJ also considered Murawski's activities of daily living, in that she reported living alone, taking care of her two children, dating, and volunteering. Therefore, the ALJ's analysis did not rely in some talismanic fashion upon a notation that Murawski's condition was stable. Instead, the ALJ conducted a holistic evaluation of the clinical and medical opinion evidence, as well as Murawski's activities of daily living, in arriving at the RFC determination in this case.

On this score, we cannot conclude that the ALJ's reliance on this objective evidence was error. Rather, the ALJ carefully contemplated all of the evidence during the relevant time period. Further, the ALJ considered Murawski's subjective symptoms but found that the objective findings and her activities of daily living did

not support her alleged level of limitation. Accordingly, we find that the ALJ's RFC determination in this case is supported by substantial evidence.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   **Conclusion**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

Submitted this 13th day of July 2023.


_s/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge